803 P.2d 930

**BRENTESON WHOLESALE, INC., an Arizona corporation, Plaintiff–Appellant,**

v.

**ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation, Defendant–Appellee.**

**1 CA–CV 88–550.**

Court of Appeals of Arizona, Division 1, Department B.

Nov. 6, 1990.

Gerald D. Sherrill, Phoenix, for plaintiff-appellant.

Snell & Wilmer by Jeffrey Messing and Nancy A. Stratta, Phoenix, for defendant-appellee.

## OPINION

LANKFORD, Judge.

Plaintiff–Appellant Brenteson Wholesale, Inc. (Brenteson) appeals from a summary

judgment granted in favor of Defendant–Appellee Arizona Public Service Company (APS).

Brenteson filed a lawsuit claiming that it could not use its private airstrip because of its proximity to an APS power transmission line. Brenteson sought an injunction against APS' operation of the power line. It also requested damages dating from the time the line had been constructed in the amount of $988,000. APS filed a motion for summary judgment, and Brenteson filed a cross-motion for summary judgment.

The superior court granted the APS motion for summary judgment and permanently enjoined Brenteson from using its airstrip. The court denied Brenteson's claim for compensation allegedly required because the injunction deprived it of use of the property as an airstrip.

We affirm the superior court's judgment.

### I.

Brenteson is a Christmas tree wholesaler. It bought Christmas trees from tree growers throughout the Pacific Northwest and sold them to retailers in Arizona and elsewhere. In 1969, Brenteson bought sixteen acres of land in Tempe, just south of Warner Road, between 56th Street and Kyrene Road. Its land was on the western border of Southern Pacific Railroad tracks.

Brenteson constructed a 1,950 foot airstrip on its property, running parallel to the railroad tracks. In 1971, the Federal Aviation Administration approved Brenteson's use of the airstrip.

APS applied to the Arizona Corporation Commission in 1981 for permission to construct a 230,000 volt transmission line to carry electricity to the South Phoenix metropolitan area. Its application included one proposed route and three alternative routes. One alternative proposed that the APS line would run along the western side of the railroad tracks, adjacent to Brenteson's property.

The Corporation Commission held a hearing on the APS application. Brenteson filed a limited appearance statement in the matter. Brenteson contended that the location of the transmission line along the railway would render its airstrip unusable and would destroy Brenteson's business. The Corporation Commission nonetheless approved this route.

In 1983, APS obtained an easement from Southern Pacific Railroad to construct its transmission line. The Corporation Commission issued a "certificate of environmental compatibility" to APS in 1985.

Brenteson then filed a lawsuit to enjoin construction of the power line. The court later dismissed this lawsuit for lack of prosecution.

APS constructed the transmission line in 1986. It is 115 feet high, and is located 140 feet east of Brenteson's property. The power line runs parallel to an existing 500,000 volt Salt River Project transmission line, which is 147 feet high, and which is located on the eastern side of the railroad tracks, 220 feet east of Brenteson's property.

Brenteson filed the instant action for injunctive relief and damages against APS in 1987. APS counterclaimed, seeking to permanently enjoin Brenteson from using its airstrip. In the alternative, APS sought to condemn an easement in Brenteson's property and pay compensation for the condemnation.

The superior court granted the APS motion for summary judgment and denied Brenteson's cross-motion for summary judgment.

Brenteson argues on appeal that the superior court erred in entering summary judgment for APS on the following issues: (1) APS' request that Brenteson be permanently enjoined from using its airstrip; (2) Brenteson's claim that the APS transmission line created a nuisance; and, (3) Brenteson's claim for compensation for the loss of use of the property as an airstrip caused by the permanent injunction issued in favor of APS.

### II.

### A.

We turn first to the propriety of the injunction against Brenteson's use of its

property as an airstrip. The superior court found that use of the airstrip created an unreasonable risk that one of Brenteson's aircraft would trespass into APS airspace and strike the APS transmission line.

Brenteson argues that whether it could use the airstrip without trespassing into APS airspace was a genuine disputed issue of fact which precluded summary judgment. Summary judgment is appropriate when the movant demonstrates that the record reveals no real dispute as to any material facts and that he is entitled to judgment as a matter of law. *United Bank of Arizona v. Allyn*, 58 Ariz.Adv. Rep. 63, 65 (Ct.App. April 17, 1990).

Brenteson claims on appeal that, under normal operating conditions, its airplanes could land and take off by flying parallel to, rather than over, the power line. However, in its arguments below in connection with the summary judgment proceeding, Brenteson repeatedly admitted that its use of the airstrip would be unsafe.

 We agree with the superior court that APS carried its burden of establishing that there was no genuine dispute that Brenteson's use of the airstrip created an unreasonable risk of a trespass and potentially serious accident.

In fact, Brenteson's complaint alleged that "Plaintiff has been unable to utilize their airstrip for fear of coming into contact with Plaintiff's [sic] high voltage power transmission lines, and thereby causing grave bodily injury and death." In its answer to the counterclaim, Brenteson admitted "that great bodily injury is likely if an aircraft comes into contact with the transmission line but denies that a permanent injunction against Plaintiff is the proper remedy." In Brenteson's own statement of facts in support of its cross motion for summary judgment, it again admitted that "[t]he erection of Defendant's power line has prevented the Plaintiff from utilizing the airstrip since June of 1986." In addition, Brenteson argued in its memorandum in response to the APS motion for summary judgment that "Defendant's 230,000 volt power transmission line ... precludes

Plaintiff from utilizing the airstrip without incurring a great risk of flying into the power lines, resulting in great bodily harm or death."

Brenteson's cross-motion for summary judgment conceded that it feared that aircraft using its airstrip would drift into the transmission line:

Plaintiff must now live with the constant fear of coming into contact with the power line on every occasion on which they either land or take-off. This fear is not due to the fact that Plaintiff is required to fly directly over the power lines of A.P.S. in making an approach in landing or taking off from the airstrip, but as a direct result of a potential crosswind which may cause the aircraft, through no fault of Plaintiff, to drift into the power lines.

Brenteson also argued in a reply memorandum in support of its cross-motion for summary judgment that it was "realistically fearful" of flying into the transmission line:

[D]ue to no fault of its own, Plaintiff is realistically fearful of coming into contact with the power lines of the Defendant through either the forces of nature or some power failure of the aircraft upon its approach to or takeoff from the airstrip. These realistic fears have manifested themselves to such an extent that Plaintiff is reluctant to use the air strip for take offs and landings as it has lawfully been doing since 1969.

The superior court was entitled to treat these statements as judicial admissions that continued use of the airstrip created a substantial risk that Brenteson's flights would encroach on APS airspace and contact the power lines, thereby causing great bodily injury. Statements in a pleading are admissible against the party making them as proof of facts admitted therein. *See Buehman v. Smelker*, 50 Ariz. 18, 27, 68 P.2d 946 (1937); *Schoonover, Inc. v. Ram Const., Inc.*, 129 Ariz. 204, 205, 630 P.2d 27 (1981).

The superior court correctly determined that there was an unreasonable risk of

encroachment by Brenteson's aircraft. Brenteson's assertion that the airstrip may be used safely comes too late on appeal and is barred as inconsistent with its previous admissions. See 1B J. Moore, *Moore's Federal Practice* ¶ 0.405[8], p. 239–42 (2d ed. 1988) (judicial estoppel doctrine bars inconsistent statements); *Dillon–Malik, Inc. v. Wactor*, 151 Ariz. 452, 728 P.2d 671 (App. 1986) (court will not consider new arguments on appeal).

Brenteson next argues that the risk of intrusions into APS airspace is not alone enough to entitle APS to an injunction. Brenteson argues that it cannot be enjoined from lawful use of its airstrip in order to prevent the mere "possibility" that a trespass would occur if a high crosswind blew one of its planes into APS' line during takeoff or landing "through no fault of its [Brenteson's] own."

■ Overflights can constitute a trespass. A.R.S. § 28–1703 provides that ownership of the space over lands is vested in the owner of the surface beneath. A.R.S. § 28–1743 provides that flight of an aircraft over land is lawful, *unless* the flight is at such a low altitude as to interfere with the existing use to which the land is put by the owner, or unless the flight is conducted in a manner imminently dangerous to persons or property lawfully on the land. The Arizona Supreme Court also explained this rule in *Brandes v. Mitterling*, 67 Ariz. 349, 355, 196 P.2d 464, 468 (1948):

> Whether in landing, taking off, or otherwise, flight over another's land, so low as to interfere with the then existing use to which the land is put, is expressly outside the statutory definition of lawful flight; and being an unprivileged intrusion in the space above the land, such flight is a trespass.

■ Notably, however, APS does not contend on appeal that it presented evidence of actual overflights within its airspace. Thus, APS has not established that any physical intrusion upon the land occurred. A physical entry on the land is an essential element of a trespass. *Restatement (2d) of Torts* § 158. Trespass by overflight similarly requires that the aircraft intrude in the space immediately above the land. *See id.* at § 159 and comment f.

■ APS defends the injunction on another basis. It argues that the injunction was based on unreasonable risks of physical trespass into the airspace and contact with the power lines.

This is a sufficient ground for injunctive relief, although not on the theory of trespass. Overflights which do not enter the plaintiff's airspace may still unreasonably interfere with the landowner's use of the land. "In such a case the liability will rest upon the basis of nuisance rather than trespass." *Restatement, supra* at § 159, comment m. A nuisance does not necessarily involve a physical intrusion on the land or an interference with the plaintiff's possession in the land. *Id.* at § 821D, comment d. Although the parties focus principally on the theory of a trespass on appeal, they both referred to the wrong as a nuisance as well, and APS has cited authority supporting relief on a nuisance theory.

The label placed upon the right of APS to relief is immaterial. The law of nuisance allowed the superior court to issue an injunction based upon a great risk of trespass and the possibility of serious resulting accidents. "Equity looks at the fact situation, and if the case appears to be one for an injunction, that relief is given without much regard to the legal categories of tort liability. Thus it is unimportant for the purpose of injunction whether the conduct involved is a continuing trespass or a nuisance, and in granting the injunction it may be indifferently classified." *Restatement, supra* at § 822, comment d.

### B.

■ We turn now to Brenteson's claim that APS created a nuisance by construction of the transmission line. Brenteson argues that the power lines are a "public nuisance" which caused special damages for which Brenteson is entitled to just com-

pensation.[1] APS contends that it had the right to make beneficial use of its easement, regardless of whether its use interfered with Brenteson's use of its airstrip.

We agree with the superior court's determination that Brenteson cannot obtain relief on this claim. This result is compelled by the fact that APS owned an easement. Its ownership interest extended to the airspace above its easement. *See* A.R.S. §§ 28–1703, –1743. *See also Restatement, supra* at § 821E, comment e (owners of easements have sufficient interest in land to bring a nuisance action). A landowner has the right to make beneficial use of the airspace above his land even when his use interferes with the use of adjoining land as an airport. *E.g., Capitol Airways v. Indianapolis Power & Light Co.,* 215 Ind. 462, 18 N.E.2d 776, 778 (1939); *Gulf Television Co. v. Brown,* 301 S.W.2d 256, 261 (Tex.App.), *aff'd,* 157 Tex. 607, 306 S.W.2d 706 (1957). *See generally* Annotation, *Airport Operator's Rights and Remedies as to Uses of Adjoining Land Interfering with Aircraft Operation,* 25 A.L.R.2d 1454 (1952).

▮ Although we need go no further in discussing the basis of the superior court's decision, we will address another allegation of error. Brenteson complains that the court erred in relying on a prior determination by the Corporation Commission that the location of the transmission line was appropriate.

The Corporation Commission was required by law to balance certain competing public interests in reaching its decision approving the location of the APS transmission line. A.R.S. § 40–360.07(B) provides:

> In arriving at its decision, the commission shall comply with the provisions of § 40–360.06 and shall balance in the broad public interest, the need for an adequate, economical and reliable supply of electric power with the desire to minimize the effect thereof on the environment and ecology of this state. The decision of the commission is final with respect to all issues, subject only to judicial review as provided by law in the event of an appeal by a person having a legal right or interest that will be injuriously affected by the decision.

When a trial court considers an application for an injunction based on an alleged nuisance, it must also employ a balancing process. "Our courts have generally used a balancing test in deciding the reasonableness of an interference. The trial court should look at the utility and reasonableness of the conduct and balance these factors against the extent of the harm inflicted and the nature on the affected neighborhood." *Armory Park v. Episcopal Community Services,* 148 Ariz. 1, 8, 712 P.2d 914, 921 (1985).

The superior court did not rule that the Corporation Commission's ruling had conclusively determined the nuisance issue. Rather, the court apparently found that the Corporation Commission's determination— that the location of the line was a reason-

---

1. Brenteson argued in its complaint, and asserts again on appeal, that the power lines constitute a public nuisance, which imposes "special damages" on Brenteson by virtue of its inability to make use of its airstrip, different in kind and degree from that suffered from the nuisance by the general public.

By articulating its claim in these terms, Brenteson stated a claim of "mixed nuisance," which our supreme court has defined as follows:

Nuisances are usually spoken of as public, private and mixed. A nuisance is common or public when it affects the rights which are enjoyed by its citizens as part of the public, while a private nuisance is one which affects a single individual or a definite number of persons in the enjoyment of some private right which is not common to the public. Mixed nuisances are those which are public and at the same time cause special damages to private individuals. The distinction does not arise from any necessary difference in the nature or the character of the thing which creates a nuisance, but is based on the difference between the rights affected thereby ... It thus appears that a private individual may have a right of action on account of either a public or a private nuisance. In the first case he must show damages which he has suffered in addition to those common to the general public.

*City of Phoenix v. Johnson,* 51 Ariz. 115, 123–4, 75 P.2d 30, 34 (1938). *See Armory Park v. Episcopal Community Services,* 148 Ariz. 1, 712 P.2d 914 (1985).

able accommodation of the competing interests—shed some light on the advisability of injunctive relief in this case. The court made its own finding that APS' use of its property was "not unreasonable when balanced against the competing public interest requiring high-power voltage lines." The balancing of competing interests is within the superior court's discretion. *Armory Park*, 148 Ariz. at 8, 712 P.2d at 921. We find no abuse of discretion in the court's consideration of the Corporation Commission's decision as a component in the balancing process.

### C.

 Finally, Brenteson argues that it was entitled to damages for its loss of the use of its airstrip resulting from the injunction. Brenteson also argues that the permanent injunction has effectively deprived Brenteson of its property rights and is tantamount to a taking of its property by APS, and that it is entitled to compensation on these grounds.

We cannot agree that the injunction is effectively a taking which entitles Brenteson to compensation as a matter of law. APS could have used its power of eminent domain under A.R.S. §§ 12–1111, –1115(C). *See Tucson Elec. Power Co. v. Adams*, 134 Ariz. 396, 656 P.2d 1257 (App.1982). However, its statutory power of eminent domain in no way diminished its statutory and common law rights as a property owner which entitled it to an injunction. If the counterclaimant in this case had instead been an owner of adjacent property without powers of condemnation, and had erected a structure other than a power line but of equal height, the counterclaimant would have been entitled to the same injunctive relief awarded to APS. That hypothetical owner would not commit a "taking" by obtaining an injunction and would not owe "just compensation" to Brenteson under Ariz. Const. Art. 2, § 17. That APS also has a power of eminent domain does not deprive it of its right as a property owner to protection of the law.

 We note that the superior court considered Brenteson's claim that it was entitled to compensation under the authority of *Spur Industries, Inc. v. Del E. Webb Development Co.*, 108 Ariz. 178, 494 P.2d 700 (1972). *Spur* suggests that the fact that Brenteson committed a nuisance does not alone bar it from compensation. *Spur* holds that the equity powers of the courts are sufficiently broad to encompass an award of compensation when required to make an injunction fair and reasonable. *See* 108 Ariz. at 184–86, 494 P.2d 700.

The supreme court directed that damages be awarded to Spur, but noted that "this relief" was "limited to a case wherein a developer has, with foreseeability, brought into a previously agricultural or industrial area the population which makes necessary the granting of an injunction against a lawful business and for which the business has no adequate relief." 108 Ariz. at 186, 494 P.2d 700. Because the facts of the present case do not fit the narrow holding of *Spur*, we do not believe that the superior court was obligated to award damages to Brenteson. However, the facts here fall within the broader equitable principle stated in *Spur*. *Spur* instructs that the superior court may invoke its equity powers to award some compensation, at least when the landowner whose use constituted the nuisance was present in the area prior to the plaintiff landowners. In this case, Brenteson's operation predated the APS power lines. The erection of the power lines rendered Brenteson's property unsuitable for use as an airstrip, and some compensation might be appropriate.

However, the superior court considered Brenteson's claim based upon *Spur* and expressly rejected that claim. On this record, we cannot say that the court abused its discretion in determining that equity did not require that APS compensate Brenteson. Moreover, Brenteson fails to urge any error in this regard on appeal, resting on the sole contention that compensation is constitutionally required because the injunction was equivalent to a taking.

For the foregoing reasons, we affirm the judgment of the superior court.

JACOBSON, P.J., and LEVI RAY HAIRE, J., concur.

*Note:* Retired Judge LEVI RAY HAIRE was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.